T.C. Memo. 1996-281

UNITED STATES TAX COURT

MAX M. AND JOAN E. GREENBERG, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 6843-94.                         Filed June 19, 1996.

<u>Andrew M. Glatt</u>, for petitioners.

<u>Christine V. Olsen</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

JACOBS, <u>Judge</u>: Respondent determined an $11,644 deficiency in petitioners' 1990 Federal income tax, and a $2,329 section 6662(a) accuracy-related penalty for such year.

The principal issue for decision concerns the proper characterization of payments petitioners received from or through an entity known as Pioneer Mortgage in 1990 totaling $44,396 (viz, whether said payments should be characterized as interest income,

as respondent contends, or as a return of capital, as petitioners contend). In the event we accept respondent's characterization of these payments, then we must further decide whether petitioners are liable for the section 6662(a) accuracy-related penalty.

All section references are to the Internal Revenue Code for the year in issue, all Rule references are to the Tax Court Rules of Practice and Procedure, and all dollar amounts have been rounded.

Some of the facts have been stipulated and are found accordingly. The stipulation of facts and the attached exhibits are incorporated herein by this reference.

### FINDINGS OF FACT

At the time they filed their petition, petitioners Max M. and Joan E. Greenberg, husband and wife, resided in San Diego, California. They timely filed a joint Federal income tax return for 1990.

Pioneer Mortgage, Inc.

Pioneer Mortgage, Inc. (Pioneer Mortgage or the company) was incorporated by Morrie Naiman (M. Naiman) on July 12, 1967. In 1975, M. Naiman died; thereafter his nephew, Gary Naiman (G. Naiman) continued the business previously conducted by his uncle (viz, the secondary mortgage market in the San Diego area) using the Pioneer Mortgage name for several interrelated companies.[1] G.

---

[1] G. Naiman operated and controlled the following

(continued...)

Naiman was president and chief executive officer of Pioneer Mortgage from the mid-1970's until the company filed for bankruptcy in January 1991.

Pioneer Mortgage originated and serviced real estate loans and sold investments purportedly related to these loans to third parties. The loans originated by Pioneer Mortgage generally were of a short-term duration and were secured by real estate. The loans were commonly known as "equity loans" because they were based primarily on the borrower's equity in the real estate securing the loan, as opposed to the borrower's creditworthiness. The interest rate and origination fees on equity loans were commensurate to the relatively high degree of risk involved.

Pioneer Mortgage offered several types of investments related to the equity loans it originated. The primary investment it offered was a purported fractionalized interest in a note and deed of trust from the borrower to Pioneer Mortgage. This type of investment was portrayed to the investor as safe and conservative. Potential investors were advised that the borrower had sufficient equity in the collateralized property to support the loan.

Another type of investment offered by Pioneer Mortgage was a mortgage pool investment known as a Collateral Mortgage Obligation

[1](...continued)
companies under the Pioneer Mortgage umbrella: Naiman Financial Corp.; Naimpro, Inc.; Naimco-Clairemont, Inc.; Naimco, Inc.; Alvarado Investment Corp.; and Frontier Service Corp. As used hereinafter "Pioneer Mortgage" refers to Pioneer Mortgage and its interrelated companies.

(CMO). The company bundled different "assets" (such as limited partnership interests and subordinated deeds of trust) and placed them in a trust account to secure the CMO. Pioneer Mortgage administered the CMO investment. The investor received a CMO certificate, which represented his proportionate ownership interest in the bundled assets, as well as a note from Pioneer Mortgage.

For his investment, the investor received purported monthly interest payments drawn on Pioneer Mortgage's bank account. Pioneer Mortgage paid interest at a rate higher than that obtainable from conventional savings accounts, Treasury bills, or money market accounts. Pioneer Mortgage forwarded monthly payments to the investors regardless of whether the borrower had at the time remitted its payment to the company.

The investors and Pioneer Mortgage typically entered into a loan service agreement pursuant to which the investor authorized Pioneer Mortgage to collect payments on, and otherwise service, the borrower's note. The loan service agreement provided that Pioneer Mortgage could grant the borrower an extension of time to remit the required monthly payments. If the borrower failed to make timely the interest payment, Pioneer Mortgage could and normally did advance the borrower an amount equal to that which was due. The loan service agreement further provided that if Pioneer Mortgage made a payment to the investor to cover the payment due from the borrower, such payment would constitute an advance and would be

repaid to Pioneer Mortgage upon receipt of the late payment from the borrower.

Pioneer Mortgage was required to inform the investor if any payment it remitted to the investor came from a source other than the borrower by designating on the check sent to the investor that such funds constitute a "loan to the lender". Thus, when Pioneer Mortgage advanced funds to the investor to cover the borrower's late interest payments, Pioneer Mortgage labeled such payment with an "L".

As of 1990, over 2,000 persons (many of whom were elderly and counted on their investments through Pioneer Mortgage to provide a fixed income retirement) had made investments through Pioneer Mortgage; the amount of these investments totaled approximately $250 million.

Petitioners' Investments

Petitioners invested in several fractionalized interests in notes and deeds of trust through Pioneer Mortgage. They also invested in a CMO. The following is a list of petitioners' investments with Pioneer Mortgage:

| Loan Provided To | Loan Number | Investment | Date of Investment | Interest Rate |
|---|---|---|---|---|
| A-440 Enterprises, Inc. (Foster) | 13230 | $25,000 | Sept. 1, 1988 | 12.75% |
| Scott Wellington Rudolph | 13232 | 25,000 | Feb. 10, 1989 | 12.75% |
| Avion Properties, Ltd. | 13412 | 50,000 | Aug. 21, 1989 | 14% |
| Naimco-Clairemont, Inc.(Sunnymead) | 13586 | 25,000 | Aug. 21, 1989 | 14% |
| Hermosa Beach Investment Co. | 13566[2] | 150,000 | Aug. 21, 1989 | 14% |
| 3.0 CMO | --- | 100,000 | Aug. 21, 1989 | 14% |

Petitioners received the following payments purportedly as interest in 1990 from Pioneer Mortgage with respect to the CMO:

| Check Date | Payments |
|---|---|
| 1/6/90 | $1,166.67 |
| 2/6/90 | 1,166.67 |
| 3/6/90 | 1,166.67 |
| 4/6/90 | 1,166.67 |
| 5/6/90 | 1,166.67 |
| 6/6/90 | 1,166.67 |
| 7/6/90 | 1,166.67 |
| 8/6/90 | 1,166.67 |
| 9/6/90 | 1,166.67 |
| 10/6/90 | 1,166.67 |
| 11/6/90 | 1,166.67 |
| Total | 12,833.37 |

Two of the statements for these payments have the notation "L".

Petitioners received the following payments purportedly as interest in 1990 with respect to their interests in notes and deeds through Pioneer Mortgage:

| Check Date | Payments |
|---|---|
| 2/1/90 | $3,156.26 |
| 3/1/90 | 3,156.26 |

---

[2] In some documents, this loan is referred to as Loan No. 13567.

| | |
|---|---|
| 4/1/90 | 3,156.26 |
| 5/1/90 | 3,156.26 |
| 6/1/90 | 3,156.26 |
| 6/30/90 | 3,156.26 |
| 8/1/90 | 3,156.26 |
| 9/1/90 | 3,156.26 |
| 10/1/90 | 3,156.26 |
| 11/1/90 | 3,156.26 |
| Total | 31,562.60 |

The monthly payment statements with respect to these investments indicate that the majority of the payments included an "L" notation.

The Demise of Pioneer Mortgage

In late 1990, Pioneer Mortgage acknowledged certain financial difficulties. In December 1990, Pioneer Mortgage stopped advancing funds to the borrowers, and failed to make interest payments for the first time. On January 9, 1991, Pioneer Mortgage and its interrelated companies filed for Chapter 11 bankruptcy protection.[3]

Shortly after Pioneer Mortgage's bankruptcy filing, the facts surrounding the company's downfall became public. Apparently Pioneer Mortgage's financial difficulties began as a result of the rapid expansion of the company into new types of products. Before the mid-1980's, Pioneer Mortgage primarily arranged short-term loans that were secured by first- or second-trust deeds on single-

---

[3]    The bankruptcy court concluded that, contrary to petitioners' belief, they did not own a direct interest in borrower notes secured by trust deeds, but rather, petitioners were unsecured creditors of Pioneer Mortgage. In 1991, all of the Pioneer Mortgage investors (including petitioners) were required to relinquish their investments to a new entity called Pioneer Liquidating Corporation.

family residences.  Gradually, the company shifted to junior deeds on larger residential and commercial loans, including hotels, resorts, and undeveloped land in California and Arizona.

Accordingly, in 1990, certain borrowers had not been making their monthly payments; rather than foreclose on the properties or notify the Pioneer Mortgage investors, G. Naiman used new investors' money to fund the continued flow of purported interest payments.[4]  The end result was a financial house of cards dependent on the influx of new investment dollars.  The house of cards could not survive in the long run.

On January 2, 1992, petitioners filed a civil lawsuit against G. Naiman and other defendants for, among other things, intentional misrepresentation, fraudulent concealment, breach of fiduciary duty, and aiding and abetting/conspiracy.[5]  A jury verdict was rendered in favor of petitioners on April 30, 1993.  The jury also awarded punitive damages.  On May 12, 1994, G. Naiman was indicted in Federal Court on charges of mail fraud and money laundering.  G. Naiman pleaded guilty to a scheme to defraud Pioneer Mortgage

---

[4]     Newspaper articles portray G. Naiman's activities as a typical "Ponzi" scheme.  Such a scheme involves a pyramiding technique by which the earlier investors receive their returns from the principal of their own funds and from the principal of later investors.

[5]     Petitioners' suit was consolidated with some 850 other lawsuits filed by Pioneer Mortgage investors seeking return of investment funds and damages in Mertyle H. Owens Trust v. San Diego Trust & Savings Bank, Consolidated Case No. 633381, in Superior Court of California, County of San Diego.

investors through illegal acts, including mail fraud and money laundering (promotion and concealment) on October 18, 1994. He is presently serving a 6-1/2 year prison sentence.

At the time of trial herein, petitioners had recovered approximately $25,000 out of their total $375,000 investment with Pioneer Mortgage.

Forms 1099

In 1991, Pioneer Service Co. (the trustee in bankruptcy) issued to petitioners two Forms 1099-INT, in the amounts of $12,833.37 and $33,416.10,[6] with regard to the payments labeled "interest" on the CMO loan and the remaining loans, respectively.

Petitioners' 1990 Federal Income Tax Return

Petitioners' accountant, Kenneth B. Healey, prepared petitioners' 1990 Federal income tax return. Because of the document matching program that the Internal Revenue Service employed, Mr. Healey determined that petitioners should report as interest income the amount ($46,249[7]) reported on the two Forms 1099-INT from Pioneer Service Co. and wash that amount out by claiming $46,249 as negative income on line 22 (Other income) of their 1990 Form 1040.

---

[6] The parties acknowledge that this amount is $1,853.50 more than the $44,396 petitioners actually received from Pioneer Mortgage in 1990.

[7] The $46,249 comprises the sum total of the amounts reported on the Forms 1099-INT issued to petitioners for 1990.

Petitioners attached a statement to their 1990 tax return which read:

> The taxpayers are holders of notes receivable, whose principal repayment is in doubt due to bankruptcy proceedings; therefore, the taxpayers are allocating payments received in 1990 to repayment of principal. The amount of the payments is $46,249.

## Notice of Deficiency

Respondent disallowed the $46,249 negative income on petitioners' 1990 return on the premise that petitioners failed to establish "that any amount is deductible under the provisions of the Internal Revenue Code." This disallowance resulted in a $46,249 increase in petitioners' 1990 taxable income.

## OPINION

Respondent claims that because the trustee in bankruptcy labeled the payments to petitioners as interest on Forms 1099-INT, such payments constitute income. Petitioners posit that the money they received from Pioneer Mortgage in 1990 does not represent interest income, but rather payments made to conceal a fraud. As such, petitioners take the position that the payments constitute a return of their capital.

The issue involved is purely factual. In their post-trial briefs, petitioners argue:

> Beginning on or about May 1, 1989 and continuing until approximately January 9, 1991, G. Naiman and others devised a scheme to defraud and obtain money and property from investors by means of false and fraudulent pretenses, representations and promises, and the concealment of material facts. As part of the scheme to defraud in the year preceding Pioneer Mortgage's

bankruptcy filing on January 9, 1991, G. Naiman and others created and maintained the illusion that Pioneer Mortgage was financially stable when in fact it was not. Pioneer Mortgage maintained this illusion in order to attract new investor funds. These new funds were applied to the monthly interest payments due previous Pioneer Mortgage investors, prior financial obligations of the various Pioneer Mortgage companies and bank over-drafts at several financial institutions.

Due to the nature of the fraud perpetrated on petitioners, there was no agreement between petitioners and Pioneer Mortgage. Petitioners believed that they were investing directly in specific promissory notes which were adequately secured by trust deeds. However, as the facts in this case clearly indicate, what petitioners ended up with was instead some sort of undivided interest as a creditor of Pioneer Mortgage's successor which is being liquidated via a bankruptcy proceeding.

The payments received by petitioners during 1990 did not originate from investments of a character and quality in which petitioners believed they had invested. Rather, the evidence clearly demonstrates that the petitioners were defrauded as to the character and quality of the investment instruments owned by them.

We agree with petitioners' characterization of the payments in question. Interest is compensation for the use or forbearance of money. Deputy v. duPont, 308 U.S. 488, 498 (1940). We conclude that the payments petitioners received through their investment with Pioneer Mortgage in 1990 were not for the use and forbearance of their money, but rather such payments were made to conceal G. Naiman's fraudulent misappropriation of petitioners' investment. Accordingly, the payments represented a return of petitioners' investment and should not be included in income as interest simply because the payments were reported as interest on Forms 1099-INT. Cf. Burnet v. Logan, 283 U.S. 404 (1931). The interest label given

to these payments was patently erroneous.  Petitioners' money was not invested in the manner promised by Pioneer Mortgage.

Because the payments petitioners received from or through Pioneer Mortgage in 1990 represented a return of capital, and not interest income, respondent's determination that petitioners are liable for the accuracy-related penalty falls by the wayside.[8] Consequently,

Decision will be entered

for petitioners.

---

[8]     Were we required to decide this issue, we would rule in favor of petitioners.